UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

DEVON FREEMAN

Case No. 23 CR 158

Judge Robert Gettleman

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S MOTION TO DISMISS

Defendant Devon Freeman is charged with being a prohibited person—in this case, a convicted felon—in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. Defendant now contends that the principles articulated in *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022), mean that Section 922(g)(1) is "constitutionally infirm because it reaches conduct that is constitutionally protected." Dkt. 184 at 5. Defendant's facial challenge to the constitutionality of Section 922(g)(1) is without merit. As over 125 federal district court opinions have held since *Bruen* was decided—including five courts in this district—nothing in the Supreme Court's decision casts doubt on the ability of the federal government to prohibit convicted felons, including defendant, from possessing a firearm. This Court should deny defendant's motion.

I.   **BACKGROUND**

On January 23, 2023, around 8:40 p.m., Chicago Police Department officers were on patrol in the Tenth District when they observed defendant standing on the west side of Spaulding holding his front waistband with both hands. There was a

large bulge protruding from defendant's front waistband, which officers believed to be a firearm.

Defendant saw the officers and started walking away southbound while blading his body and continuing to hold his front waistband. One of the officers asked defendant out the open window of the car whether defendant any weapons. Defendant did not respond, and the officer then asked defendant to take his hands out of his pockets. Defendant took off and started running westbound through the alley, holding the front of his waistband and looking back at the officers. Officers jumped out of the car and chased defendant down the alley.

Defendant ran into a garbage can, knocked the garbage can over, and lost his footing. He continued to run while looking back at the officers and ran into the front of a vehicle that was parked in the middle of the alley. As defendant fell to the ground, one of the officers heard the sound of a metallic object striking concrete. After defendant was detained, one of the officers recovered a firearm from the concrete in front of the passenger side of the vehicle. The firearm had an auto-sear and an extended magazine. Officers asked defendant if he had a FOID or a CCL and he answered that he did not.

Defendant, who has a criminal record that includes prior felony convictions, was prohibited from possessing a firearm under 18 U.S.C. § 922(g)(1). That statute provides that "[i]t shall be unlawful for any person…who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to ship,

transport, possess, or receive any firearm or ammunition in or affecting interstate or foreign commerce.[1] In particular, defendant has prior adult felony convictions in Illinois for Aggravated UUW/Vehicle/Loaded Firearm (2018) and Aggravated Battery w/ Firearm/Person (2008).

On March 21, 2023, a federal grand jury returned an indictment against the defendant charging him with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. On May 3, 2023, defendant filed a motion to dismiss the indictment, arguing that, based on *Bruen*, defendant cannot be convicted of a § 922(g) offense because the statute is overbroad. Dkt. 27.

## II.   SECTION 922(G)(1)'S PROHIBITION ON GUN POSSESSION BY FELONS IS CONSTITUTIONAL.

### A.   Legal Standard

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. 554 U.S. 570, 635 (2008). The Court cautioned, however, that the right to keep and bear arms "is not unlimited" and remains subject to "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons." *Id*. at 626, 627

---

[1] Section 922(g)(1) concerns any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." In this filing, the government refers to such individuals as felons.

3

n.26. Two years later, the Supreme Court extended *Heller* to state and local governments, while "repeat[ing] [the] assurances" that it "made…clear" in *Heller* that its "holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons….'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (plurality) (quoting *Heller*, 554 U.S. at 626-27).

More recently, in *Bruen*, the Court again considered the meaning of the Second Amendment, this time, in connection with a New York licensing scheme which allowed authorities to deny concealed carry permits even to those who met threshold criteria. In so doing, the Court articulated an analytical framework for determining whether a firearm regulation is constitutional, directing courts to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen,* 142 S. Ct. at 2131. This analysis involves two questions. First, a court must consider whether "the Second Amendment's plain text covers an individual's conduct," and if it does, then "the Constitution presumptively protects that conduct." *Bruen,* 142 S. Ct. at 2129-30. In that scenario, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

As the government details next, under *Bruen*'s "text and history" test, § 922(g)(1) remains a permissible restriction on firearms possession because felons do

not fall within the textual purview of the Second Amendment, and even if they did, § 922(g)(1) is still constitutionally permissible because the statute is consistent with this nation's historical regulation of firearms. This conclusion is appropriate under *Bruen*, which repeatedly stressed that the right to bear arms belongs only to "'law-abiding, responsible citizens'" and which said nothing to cast doubt on the constitutionality of § 922(g)(1), instead recognizing that the right to keep and bear arms is subject to reasonable restrictions. 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635); *see also id.* at 2156-57, 2162.

Additionally, upholding § 922(g)(1) as constitutional would be with consistent with pre-*Bruen* Seventh Circuit precedent, including multiple cases observing that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm unvirtuous citizens, including felons." *See Kanter v. Barr*, 919 F.3d 437, 446 (7th Cir. 2019) (quoting *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) (internal quotation marks omitted)).

In stark contrast, defendant cites no authority to support his argument. Nor could he. Every federal court to have addressed the constitutionality of § 922(g)(1) post-*Bruen*, of which the government is aware, has concluded that the statute remains constitutional.[2] Five courts in the Northern District of Illinois are among

---

[2] The government is aware of over 125 rulings upholding the constitutionality of § 922(g)(1) post-*Bruen*. It has attached a list of those rulings as Exhibit A to this response. *See also United States v. Robinson-Davis*, 2023 WL 2495805 (W.D. Va. Mar. 14, 2023) (collecting cases upholding constitutionality of 18 U.S.C. § 922(g)(1) post-*Bruen*). One judge in the Northern

5

that group. *See United States v. Garrett*, No. 18 CR 880 at Dkt. 144 (N.D. Ill. Jan. 11, 2023) (Bucklo, J.); *United States v. Price*, No. 21 CR 164 at Dkt. 122 (N.D. Ill. Feb. 13, 2023) (Kennelly, J.); *United States v. Price*, No. 19 CR 824 at Dkt. 105 (N.D. Ill. Mar. 3, 2023) (Guzman, J.); *United States v. Dixon*, No. 22 CR 140 at Dkt. 76 (N.D. Ill. Mar. 28, 2023) (Kendall, J.); *United States v. Williams*, No. 19 CR 66 at Dkt. 192 (N.D. Ill. April 21, 2023) (Kennelly, J.); *United States v. Laderick Murphy*, No. 21 CR 76 at Dkt. 69 (N.D. Ill. May 3, 2023) (Shah, J.); *United States v. Williams*, No. 22 CR 121 at Dkt. 42 (May 3, 2023) (Shah, J.). This Court should once again rule the same and deny defendant's motion.[3]

### B. Possession of Firearms by Convicted Felons Is Not Protected Under the Plain Text of the Second Amendment.

The Second Amendment, by its terms, protects "the right of the people to keep and bear arms." Under *Bruen*, a court must first consider whether § 922(g)(1) regulates conduct that is covered by that plain text. 142 S. Ct. at 2129-30. The

---

District of Illinois has elected to defer ruling on a motion to dismiss a Section 922(g)(1) charge as unconstitutional pending a Seventh Circuit ruling in *Atkinson v. Garland*, No. 22-1557. *See United States v. Christopher Coleman*, 21 CR 252, Dkt. No. 59 (Ellis, J.). *Coleman* recognized, however, that *Atkinson*—which, unlike the instant facial challenge to Section 922(g)(1), only involved an as-applied constitutional challenge to the statute—could simply "remand *Atkinson* to the district court for further development of the record." *Id.* at n.5. *See also infra* at n.6 (discussing *Atkinson*).

[3] This Court and one other judge in this district have upheld the constitutionality of other federal statutes criminalizing the possession of firearms post-*Bruen*. *See United States v. Seiwert*, No. 20 CR 443 at Dkt. 89 (N.D. Ill. Sept. 28, 2022) (Gettleman, J.) (upholding the constitutionality of § 922(g)(3), which makes unlawful the possession of firearms by unlawful drug users); *United States v. Carbajal-Flores*, No. 20 CR 613 at Dkt. 74 (N.D. Ill. Dec. 19, 2022) (Coleman, J.) (upholding the constitutionality of § 922(g)(5), which makes unlawful the possession of firearms by individuals who are unlawfully in the United States).

6

Supreme Court has consistently interpreted that text to apply only to "law-abiding, responsible citizens" and, by extension, to exclude convicted felons, like defendant. *See Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2131.

In *Heller,* the Supreme Court struck down the District of Columbia's ban on handgun possession in the home, explaining that the Second Amendment confers an individual "right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. *Heller* expressly contemplated that certain citizens were "disqualified" from keeping or bearing arms under the Second Amendment. *Id.* at 635 ("*Assuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home.") (emphasis added). Most relevant to defendant's motion, *Heller* explained that "nothing in [the Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and further cautioned: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 626-27 & n.26; *see also McDonald*, 561 U.S. at 786 (reaffirming *Heller*'s assurance that firearms regulation is not prohibited by the Second Amendment).

*Bruen* did not deviate from *Heller's* principle that the right to bear arms belongs only to "law-abiding, responsible citizens." 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Indeed, *Bruen* characterized the holders of Second Amendment rights as "law-abiding" citizens no less than 14 times. For example, in *Bruen*, the

Court concluded that the New York statute "violates the Fourteenth Amendment in that it prevents *law-abiding* citizens with ordinary self-defense needs from exercising their right to keep and bear arms," *id.* at 2156 (emphasis added); explained that the Second Amendment "'elevates above all other interests the right of *law-abiding*, responsible citizens to use arms' for self-defense," *id.* at 2131 (quoting *Heller*, 554 U.S. at 635) (emphasis added); and instructed courts to identify historical analogues to modern firearm regulations by assessing "how and why the regulations burden a *law-abiding* citizen's right to armed self-defense," *id.* at 2133 (emphasis added).[4]

Moreover, like *Heller*, *Bruen* did not question the constitutionality of "shall-issue" concealed-carry licensing regimes, employed by 43 states, that "require applicants to undergo a background check or pass a firearms safety course" to ensure

---

[4] *See also Bruen* 142 S. Ct. at 2122 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *id.* ("[O]rdinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense."); *id.* at 2125 (describing petitioners as "law-abiding, adult citizens"); *id.* at 2133 (referencing New York's argument that "sensitive places where the government may lawfully disarm law-abiding citizens include all places where people typically congregate" (quotations omitted)); *id.* at 2134 (reiterating that petitioners are "two ordinary, law-abiding, adult citizens"); *id.* at 2135 n.8 ("[I]n light of the text of the Second Amendment, along with the Nation's history of firearm regulation, we conclude below that a State may not prevent law-abiding citizens from publicly carrying handguns...."); *id.* at 2138 ("Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense."); *id.* at 2138 n.9 (noting shall-issue public carry licensing laws "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry" but rather "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" (quotation omitted)); *id.* at 2150 ("none [of the historical regulations surveyed] operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose"); *id.* at 2156 ("Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to demonstrate a special need for self-protection...." (quotations omitted)).

that "those bearing arms" are "law-abiding, responsible citizens." *Id.* at 2138 n.9 (internal quotation marks omitted).

Concurring opinions in *Bruen* also emphasized the narrow scope of the Court's holding. Justice Alito, concurring, wrote that the Court had not "disturbed anything that we said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157; *see id.* at 2159 ("All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense…."). Justice Kavanaugh, joined by Chief Justice Roberts in a separate concurring opinion, noted the "presumptively lawful regulatory measures" described in *Heller*, including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 2162. Moreover, Justice Kavanaugh's concurrence observed that *Bruen* only concerned "may-issue" licensing regimes. *Id.* It did not reach "shall-issue" licensing regimes— which commonly disqualify felons and the mentally ill, and which, he indicated, are likely constitutional. *Id.*

*Heller's* and *Bruen's* repeated emphasis that the right to bear arms belongs only to "law-abiding, responsible citizens" directly refutes defendant's argument that the Second Amendment does not limit its protection to only law abiding citizens but extends to "the people," i.e., anyone who is part of the national community and includes even those with felony convictions. *See id.* at 3-4. The frequency with which *Bruen* employed the phrase "law abiding, responsible citizens"—rather than a

9

broader reference to "the people" or "all Americans"—strongly indicates that this was a deliberate choice of language that should be afforded due weight. As one district court explained in its recent memorandum opinion and order rejecting a *Bruen*-based constitutional challenge to § 922(g)(1):

> Indeed, the *[Bruen]* majority used the phrase "law-abiding" to describe "the people" whose rights the Second Amendment guarantees no fewer than fourteen times, including in its concluding paragraph."
>
> * * *
>
> The government argues that those charged under section 922(g)(1), by definition, are not law-abiding citizens but rather are among the classes of individuals whose rights to bear arms historically have been restricted for public safety. The Court agrees with the government. *Section 922(g)(1) is a constitutional restriction on firearms possession because convicted felons— whether their underlying felony was violent or not—are, by definition, not law- abiding and therefore do not fall within the textual purview of the Second Amendment.*

*See Price*, No. 21 CR 164, Dkt. 122 at 4-5 (emphasis added). *Accord Price*, No. 19 CR 824, Dkt. 105 at 1 ("This Court agrees with Judge Kennelly's thorough and well-reasoned analysis [in *Price*] and adopts it here."*); Garrett*, No. 18 CR 880, Dkt. 144 at 4 (Bucklo, J.) ("[T]he *[Bruen]* majority uses the phrase 'law-abiding' to describe 'the people' whose rights the Second Amendment guarantees no fewer than fourteen times."); *Seiwert*, No. 20 CR 443, Dkt. 89 (N.D. Ill. Sept. 28, 2022) (Gettleman, J.) (right defined in *Heller* "extends only to 'the people,' which encompasses only 'law-abiding, responsible' citizens who keep or bear arms for 'lawful purposes'"); *Williams*, No. 22 CR 121, Dkt. 42 at 3 (May 3, 2023) (Shah, J.) (There is room to argue that felons fall within "the people," but without binding precedent on that front, I accept

the Supreme Court's statement that felon disarmament is presumptively lawful, and therefore outside the right protected by the Second Amendment").

The Seventh Circuit's decision in *United States v. Meza-Rodriguez,* 798 F.3d 664 (7th Cir. 2015), cited by defendant, does not alter this analysis. In *Meza-Rodriguez,* the Seventh Circuit stated that while some of the language used in *Heller* linked Second Amendment rights with notions of "law-abiding citizens," those passages did not, themselves, define the term "people." *Meza-Rodriguez*, 798 F.3d at 669. But, as explained more below, *Meza-Rodriguez* was written before *Bruen* and did not benefit of *Bruen's* repeated use of the phrase "law-abiding citizens" to describe the scope of the Second Amendment. Moreover, as *Meza-Rodriguez* itself notes in this passage, the Supreme Court did, in *Heller*, place weight on this language in reaching its decision.

Moreover, an argument that the phrase "the people" must be used consistently throughout the Founding Era constitutional text proves too much and attempts to paper over fundamentally different aspects of fundamentally different rights. For instance, noncitizens are not among "the people" who may vote in congressional elections. *See* U.S. Const. Art. I § 2 cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year by *the People* of the several States") (emphasis added)); 18 U.S.C. § 611 (excluding illegal immigrants from voting in elections for federal offices). Or as the district court noted in *Price*, an argument that "the people" should be defined consistently for purposes of various amendments

11

"ignores the differences between the rights protected by the First and Second Amendments, as the exercise of rights under the First Amendment do not put at risk the physical safety of others." *See Price*, No. 21 CR 164, Dkt. 122 at 8-9.

In short, the possession of firearms by convicted felons is not protected under the plain text of the Second Amendment.

## C. Section 922(g)(1) Is Consistent with Historical Traditions.

Even if this Court were to conclude that the Second Amendment covers defendant's conduct, defendant still cannot prevail on his *Bruen*-based argument. Under *Bruen*, even where the plain text of the Second Amendment covers the challenged conduct, the government may still justify a challenged restriction by showing "that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. Because § 922(g)(1) is in keeping with this nation's historical traditions, this Court should not declare it unconstitutional.

*Bruen* contemplated two avenues of historical inquiry. The first is what the Supreme Court described as a "straightforward historical inquiry" which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." 142 S. Ct. at 2131. The second avenue of inquiry that *Bruen* directed is by "analogy." *Id.* at 2132. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.*

12

Where there is no such straightforward correspondence, *Bruen* directed courts to consider "historical analogies" to the challenged law to determine whether it resembles constitutionally accepted restrictions. *Id*. *Bruen* further explained: "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).

Consistent with the methodology set forth in *Bruen*, the D.C. Circuit Court of Appeals in *Medina v. Whitaker* engaged in a comprehensive historical analysis demonstrating that § 922(g)(1) is consistent with this nation's history and tradition of firearm regulation. 913 F.3d 152, 158 (D.C. Cir. 2019) (citation omitted). In *Medina,* the D.C. Circuit held that "those convicted of felonies are not among those entitled to possess arms. *Id.* at 160. The DC Circuit explained that when this nation was founded, convicted felons faced serious repercussions, such as "a total forfeiture of either lands, or goods, or both" as well as capital punishment. *Id*. at 158. With respect to capital punishment in particular, *Medina* explained that "[f]elonies were so connected with capital punishment that it was hard to separate them." *Id.* (citation omitted); *see also id*. (capital punishment was "the standard penalty" for felonies during the colonial era); *id*. (describing capital punishment for felonies as "ubiquitous" in the late 18th century). *Medina* further explained that historically, felony crimes were not just limited to "crimes of violence, such as murder and rape";

13

they also included nonviolent felony offenses such as counterfeiting currency, embezzlement, desertion from the army, forgery, and horse theft. *Id.* With this historical perspective in mind, the *Medina* court concluded that it is difficult to conclude that, on the one hand, our nation's historical tradition does not permit disarming convicted felons, when, on the other hand, our nation would permit executing convicted felons, including non-dangerous ones. 913 F.3d at 158 ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.").

In addition, in *Range v. Garland*, 53 F.4th 262, 273 (3d Cir. 2022), a Third Circuit three-judge panel rigorously applying *Bruen's* "text and history" test to Section 922(g)(1) to conclude that the statute "comports with legislatures' longstanding authority and discretion to disarm citizens unwilling to obey the government and its laws." Although the Third Circuit later vacated the *Range* panel's opinion after granting a petition for rehearing *en banc* (2023 WL 118469 (3d Cir. Jan. 6, 2023)), this Court may still consider the historical analysis set forth in the *Range* panel opinion which, as explained next, is consistent with *Bruen*.[5]

*Range's* historical analysis kept at its forefront *Bruen's* warning that "'not all history is created equal,'" its "catalogu[ing] [of] sources that are most probative of the right's original meaning," and its emphasis on "'English history dating from the late 1600s, along with American colonial views leading up to the founding.'" 53 F.4th at

---

[5] The Third Circuit held an *en banc* oral argument in *Range* on February 15, 2023. A decision remains pending.

274 (quoting *Bruen*, 142 S. Ct. at 2127, 2136). In applying this methodology, *Range* concluded that "the pertinent historical periods were replete with laws 'relevantly similar' to the modern prohibition on felon firearm possession because they categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Id.* (citation omitted).

Starting in the late seventeenth century in England and continuing through colonial America, the Revolutionary War, and ratification debates, *Range* identified a wide range of historical support for the ability of legislatures to disarm those not considered to be law-abiding. 53 F.4th at 273-82. As just one example of the historical support it found, *Range* discussed the proposed amendment of the Dissent of the Minority in Pennsylvania—an essay published by Pennsylvania's anti-Federalist delegates during debates over the Constitution's ratification. *Id.* at 279-80. *Heller*, the Seventh Circuit, and the Third Circuit all have recognized this particular source as a "highly influential" "precursor" to the Second Amendment. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc); *Range*, 53 F.4th at 280 ("[T]he Supreme Court has viewed [the amendment] as 'highly influential' to the adoption of the Second Amendment.") (quoting *Heller*, 554 U.S. at 604)). The amendment proposed by the Dissent of the Minority stated:

> [T]he people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals."'

*Range*, 53 F.4th at 280 (quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971)) (emphasis in original). *Range* explained: "As the Dissent of the Minority's proposal makes clear, members of the Founding generation viewed "[c]rimes committed—violent or not—[as]…an independent ground for exclusion from the right to keep and bear arms." *Id.* (quoting *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 349 (3d Cir. 2016) (alterations and omissions in original).

Moreover, like *Medina*, *Range* analyzed the severity of the consequences that convicted felons faced at the time of this nation's founding. 53 F.4th at 280-81. The *Range* panel explained that "[h]istorically, several non-violent felonies were punishable by death and forfeiture of the perpetrator's entire estate." *Id.* at 280. "*A fortiori*," the *Range* panel continued, given the draconian punishments that traditionally could be imposed for these types of non-violent felonies, the comparatively lenient consequence of disarmament under 18 U.S.C. § 922(g)(1) is permissible." *Id.*

At bottom, the *Range* panel drew three critical lessons from its historical review that can inform this Court's analysis:

> First, legislatures traditionally used status-based restrictions to disqualify categories of persons from possessing firearms. Second, they did so not merely based on an individual's demonstrated propensity for violence, but rather to address the threat purportedly posed by entire categories of people to an orderly society and compliance with its legal norms. Third, legislatures had, as a matter of separated powers, both authority and broad discretion to determine

16

when individuals' status or conduct evinced such a threat sufficient to warrant disarmament.

53 F.4th at 281-82.

Defendant's argument to the contrary largely relies on decisions and dissents that predate the court's decision in *Bruen*. Dkt. 27 at 3-5. However, as explained below, those opinions were written without the benefit of *Bruen's* repeated use of the phrase "law-abiding citizens" to describe the scope of the Second Amendment and without the benefit of *Bruen's* historical analogue inquiry. Moreover, even decisions examining the historical roots of felon-possession-bans ultimately support the conclusion that § 922(g)(1) is consistent with long-standing regulations. In *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives,* 700 F.3d 185, 196 (5th Cir. 2012), *abrogated by Bruen,* 142 S. Ct. at 2111, for example, the Fifth Circuit noted that *Heller* demonstrated that "a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." 700 F.3d at 196; *see also id.* ("After all, *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current version of these bans are of mid-20th century vintage."). In *United States v. Booker,* 644 F.3d 12, 23 (1st Cir. 2011), the First Circuit noted that "the federal felony firearm possession ban [under § 922(g)(1)] bears little resemblance to laws in effect at the time the Second Amendment was ratified." But at the same time, the First Circuit acknowledged that *Heller's* reference to "longstanding prohibitions" means that statutory prohibitions on the possession of weapons by some persons *are* proper and that "'the legislative role

did not end in 1791.'" *Id.* (quoting *Skoien*, 614 F.3d at 640). *Booker* thus concluded that "exclusions" to the Second Amendment "need not mirror limits that were on the books in 1791" and that it cannot be said that "the relative age of a regulation is the key to its constitutionality." *Id.* at 24.

In sum, based on the extensive historical analysis set forth above, and every district court to address the issue post-*Bruen*, including district courts in the Northern District of Illinois, this Court should uphold the constitutionality of Section 922(g)(1).

### D. Upholding § 922(g)(1) as Constitutional Is Consistent with Seventh Circuit Precedent.

Holding § 922(g)(1) constitutional is consistent with the Seventh Circuit's pre-*Bruen* caselaw, which has upheld the statute even when the underlying felony conviction is for a nonviolent offense. *E.g., Hatfield v. Barr*, 925 F.3d 950, 952 (7th Cir. 2019) (noting that *Heller* and *McDonald* treat felon-dispossession statutes as valid and holding that Section 922(g)(1) may be applied to a felon convicted of fraud).[6] *See Price*, No. 21 CR 164, Dkt. 122 at 3-4 (rejecting argument that under Seventh Circuit precedent, § 922(g)(1) is unconstitutional, even as applied to non-violent or non-dangerous felons); *Garrett*, No. 18 CR 880, Dkt. 144 at 7-8 ("Nothing in

---

[6] Pre-*Bruen*, every federal court of appeals to have addressed the issue had held that Section 922(g)(1) does not violate the Second Amendment on its face. *See Kanter*, 919 F.3d at 442 (collecting cases). Post- *Bruen*, the Seventh Circuit has not addressed the constitutionality of Section 922(g)(1), although there is a pending case before that court in which plaintiff-appellant, who has a felony mail fraud conviction, has advanced an as-applied challenge to Section 922(g)(1)'s constitutionality. *See Atkinson v. Garland*, No. 22-1557 (7th Cir.). The Circuit held oral argument on November 8, 2022. A decision remains pending.

defendant's submissions suggests that the Seventh Circuit takes a different view of the Supreme Court's jurisprudence or that its own cases compel a contrary conclusion.").

Critically, in line with *Bruen*, the Seventh Circuit has identified historical support for barring felons from possessing firearms. In *Yancey*, for example, the Court noted that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm unvirtuous citizens" such as felons. 621 F.3d at 684-85 (citation omitted); *see also Kanter*, 919 at 446 (quoting *Yancey*).

A robust discussion of the historical basis for prohibiting felons from possessing firearms can also be found in *Skoien,* 614 F.3d at 640 (quoting *Heller*, 554 U.S. at 604). There, the Seventh Circuit cited the "highly influential" Dissent of the Minority from the Pennsylvania ratifying convention. In the essay published by Pennsylvania's anti-Federalist delegates during debates over the Constitution's ratification the Dissent of the Minority asserted that citizens have a personal right to bear arms "unless for crimes committed, or real danger of public injury." *Id. Skoien* also observed "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Id.* (citing Stephen P. Halbrook, *The Founders' Second Amendment* 273 (2008), and C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Policy 695, 700-13 (2009)). In

light of this history, the Seventh Circuit determined that "some categorical disqualifications are permissible" under the Second Amendment. *Id.* at 641.

Finally, in *Kanter*, the Court described the case law—and underlying historical sources—as "suggest[ing] that felons were not historically understood to have Second Amendment rights." 919 F.3d at 445-46; *see also id.* at 446 n.6 (citing numerous legal historians who have endorsed the view that the government could disarm felons).

To be sure, *Kanter* did not resolve the historical scope of the Second Amendment. 919 F.3d at 447. And *dissenting* Seventh Circuit judges have suggested that the historical record does not conclusively support a categorical ban on firearm possession by felons. *Id.* at 464 (Barrett, J., dissenting) ("History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons."); *id.* at 458-62 (Barrett, J., dissenting) (describing as "misguided" the argument that the disarmament of felons is supported by the severity with which felons were punished at the time of the nation's founding); *Skoien*, 614 at 650 (Sykes, J., dissenting) (noting scholarly "disagree[ment] about the extent to which felons . . . were considered excluded from the right to bear arms during the founding era," and that "[t]he historical evidence is inconclusive at best").

But these dissents pre-date *Bruen*. Therefore, they were necessarily written without the benefit of *Bruen's* repeated use of the phrase "law-abiding citizens" to describe the scope of the Second Amendment. And, as a result, they naturally contemplated different results. *See e.g.*, *Meza-Rodriguez*, 798 F.3d at 669 (in a pre-

20

*Bruen* analysis of the constitutionality of Section 922(g)(5), which prohibits the possession of firearms by unlawful "aliens," expressing reluctance "to place more weight on [*Heller*'s] passing references" to the phrase "law-abiding citizens"). But given the frequency with which *Bruen* emphasized that "the people" contemplated by the Second Amendment were "law-abiding" ones, that deliberate choice of language should be afforded the weight it deserves in order to conclude that the Second Amendment does not protect the possession of firearms by any convicted felon, including defendant.

The aforementioned dissents were also written without the benefit of *Bruen*'s historical analogue inquiry, which, as discussed above, the D.C. Circuit Court of Appeals faithfully applied in *Medina*. Defendant points to then-Judge Barrett's dissent in *Kanter*, asserting that she concluded that the 922(g)(1) statute was unconstitutional in its overbreadth. Dkt. 27 at 5 (citing *Kanter*, 919 F.3d at 464-65 (Barrett, J., dissenting) (arguing that the constitutionality of gun dispossession laws like 922(g)(1) fails when felons lose their Second Amendment rights solely due to their status as felons rather than because of legislative action based on a historical tradition of excluding persons deemed dangerous). But aside from being a dissenting opinion, that statement cannot be dispositive, given *Bruen*'s directive that courts may consider historical analogues to support modern-day firearm regulations. As the Court explained in *Bruen*, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133

(emphasis in original). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. And as discussed above, consistent with *Medina*, the government has shown that there are historical analogues demonstrating that those whose criminal records evince disrespect for the law are not law-abiding citizens entitled to possess firearms.

In short, although the Seventh Circuit has not previously resolved the historical scope of the Second Amendment, its prior analysis "suggest[ing] that felons were not historically understood to have Second Amendment rights," *Kanter*, 919 F.3d at 445, is consistent with *Bruen*'s repeated use of the phrase "law-abiding" citizens to describe the people who hold the right.

## III.   CONCLUSION

For the reasons stated above, the Court should deny defendant's motion to dismiss.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney


Dated: May 22, 2023             By:   /s/ *Megan E. Donohue*
                                      MEGAN E. DONOHUE
                                      Assistant United States Attorney
                                      219 S. Dearborn St., Rm. 500
                                      Chicago, IL  60604
                                      (312) 353-1877

22