IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 23-158 |
| | ) | |
| DEVON FREEMAN, | ) | Honorable Robert Gettleman, |
| | ) | Judge Presiding. |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S
RESPONSE TO DEFENDANT'S RECONSIDERAION MOTION**

Now comes the Defendant, DEVON FREEMAN, by his attorney, Donna Hickstein-Foley, and replies to the Government's Response to his Motion to Reconsider the Court's Denial of his Motion to Dismiss the Indictment based on the Unconstitutionality of 18 U.S.C. §922(g)(1) known commonly as Felon in Possession of a Firearm.   In support of Defendant's reply, it is stated:

**Defendant's Summary of Burden**

Following the review of the Government's Response, Defendant reaffirms his prayer for relief requesting his Motion for Reconsideration be granted.  It is fundamental and therefore undisputed the Government has the burden of proof under the law to show a statute does not violate the Constitution. As discussed below, the Government has failed to present clear and unambiguous historical proof that the challenged law is consistent with this Nation's historical tradition of firearm regulation as of 1791.  The Supreme Court in ***New York Rifle and Pistol***

1

*Association v. Bruen*, 597 U.S. \_\_\_, 142 S.Ct. 2111 (2022)[1] held that if the Government fails to present such proof, or if the evidence of the tradition is ambiguous, or uncertain, or even close, the challenged law is unconstitutional. For ease of review, Defendant has maintained the Government's sections upon which to comment. But before doing so, Defendant briefly reviews *Bruen* which serves as a reminder of why the courts have reached this point.

<em>Bruen</em> Holding

*Bruen* held the plain text of the Second Amendment covers an individual's conduct. *See* Slip Op., p. 8. At its core, is the right of self defense. *Id*. at 8-9. Therefore the Constitution presumptively protects that conduct. Only if a firearms regulation is consistent with the Nation's historical tradition may a court conclude the individual's conduct falls outside the Second Amendment's protection. *Id.* Government bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 10. A simple statement in its holding but nevertheless an analytically significant one setting a standard which courts must follow in upholding or rejecting the validity of statutes under the Second Amendment. As the Court in *United States v. Bullock* observed, this analytical standard ". . . is the law of the land." \_\_ F. Supp. 3d \_\_, p. 3 (06/28/23) (USDC, Miss).

## I. Introduction

The Government's introduction relies heavily on its statistic that there are approximately 174 federal district court cases (including five in this district) which have upheld the

---

[1]While Defendant initially cites the formal S.Ct. Citation, he does not have actual access to this cite at this time. In further discussion, Defendant cites to the Supreme Court Slip Opinion for 20-843 by its page references and has provided the Court with that version.

constitutionality of §922(g)(1). Since the approximately 174 cases cited or otherwise referred to by the Government fail to incorporate the *Bruen* analytical framework (including the five in this district), this number is not helpful to this Court in resolving this motion. [2]

## II. Factual Background

For purposes of the issue addressed in Defendant's Motion to Dismiss and his Motion for Reconsideration, Defendant continues to rest on his previously entered plea of not guilty.

## III. Legal Background

The Government argues that Defendant, as the moving party requesting reconsideration, fails to meet the high standard required for a court to grant such relief. It cites to five general principles, any of which if met would allow a court to find reconsideration appropriate. In concluding that Defendant cannot meet his burden, the Government completely ignores the significant fact that the 7th Circuit in *Atkinson v. Garland*, USCA Case No. 22-1557 (June 20, 2023) has remanded this very issue back to the district noting "*Bruen* leaves no room for doubt: text and history, not a means-end analysis, now define the controlling Second Amendment inquiry." No. 22-1557, p. 3. Clearly, there has been a controlling or significant change in the law in this Circuit since the submission of Defendant's original motion to dismiss. In light of this holding, Defendant has met the reconsideration burden.

---

[2] *United States v. Bullock* cites to *District of Columbia v. Heller*, 554 U.S. 570, 674, n. 24 which at that time rejected "hundreds of [prior] judges' decisions" noting that the volume of previous case law was not relevant to its landmark Second Amendment analysis. *Bullock* continues this rejection by further casting doubt post *Heller*, and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) about the process the more recent cases used to determine the history of the felon-in-possession ban. It notes among other points that in none of those cases did the government submit an expert report from a historian justifying felon disarmament. "Mere volume of cases is not enough". *See* __F.Supp3d__, first page, second column.

## A. Bruen's "Text and History" Test

The Government's discussion of *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) is not relevant to the issue at hand. *Bruen*, in eradicating the two step framework of previous Second Amendment holdings and in mandating an historical analogue test, eliminates *Heller's* presumption of constitutionality of gun laws. *See* Slip Op., at 8. Without the *Bruen* Second Amendment analysis, it is an unsupported conclusory leap to rely on either of the earlier holdings to assume the Supreme Court is predisposed to find the Second Amendment limited to "law abiding citizens".[3] Because the felon in possession issue was not before the Court in *Heller*, the *Heller* language was dicta. Because it was not before the Court in *Bruen*, the *Bruen* language is dicta. It cannot be persuasively argued that *Heller* contains a presumption against felons because it was never analyzed under the new standard. Under *Bruen*, the plain text of the Second Amendment's right to bear arms does not favor governmental restriction but disfavors restrictions when the individual right of the people to be armed is infringed.

The Government attempts to lead the Court away from the issue at hand as it presents a convoluted discussion of the concept of analytical reasoning. This attempt at dissecting the philosophical framework for determining whether the Government has met its burden only sets the Court on a path of confusion. *Bruen* simply says there are two analytical vehicles possible here for the Government to satisfy its burden. It can offer a historical record of the very issue at hand, i.e., whether our society has a history of regulation which limits firearms for those individuals who were felons. Alternatively, if either the historical record is itself limited on this

---

[3]The Government relies heavily throughout its Response on this term, which neither it nor *Bruen* defines. Terms such as "law abiding", "ordinary citizen", "responsible citizen" are vague, overbroad and ambiguous.

4

issue or even if it is not, the Government can provide examples of purportedly similar groups in our society and analogize to the issue at hand. *See* Slip Op. at 17-21. As demonstrated later in this pleading, the Government did not do either. *See* Defendant's Exhibit A citing the Government's original Exhibit B.

### B. Under Bruen's Framework, the Overwhelming Majority of Federal Courts Have Upheld §922(g)(1) as Constitutional

The Government's analysis under this section does not hold together for several reasons. As Defendant already commented, the Government can say 174 separate rulings have concluded that §922(g)(1) remains constitutional. But unless the rulings follow the required analytical framework ordered by ***Bruen***, they are not relevant much less dispositive. *See **Bullock*** at 3. The Government argues "[i]n ***Bruen***, six Justices emphasized that certain firearms regulations–including prohibitions on felons' possession of firearms–remain constitutional." (Gov't Response, p. 7) This is somewhat misleading since there was no six seat majority or any majority for that matter revealing predisposition for the constitutionality of §922(g)(1). Neither ***Bruen's*** three dissenters nor its three concurrers won the day. There has been no ***Bruen*** Second Amendment analysis before the Supreme Court on the issue of felon in possession. Therefore, the majority opinion as written by Justice Thomas does not hold and cannot be considered a precursor of its constitutionality.

The Government touts the finding in the 8th Circuit in ***United States v. Jackson***, 69 F.4th 495 (2023) as persuasive in convincing this Court to rule against Defendant's Motion for Reconsideration. Defendant contends there are major weaknesses in the ***Jackson*** ruling and should not be relied on in this Circuit. First, the ***Jackson*** Circuit Court points to several

5

examples in the historical record of post Elizabethan England extending into the Stewarts and Cromwell and back to the Stewarts and the Kings of Orange and finally the Hanovers. According to the Government's Response, during this time, Catholics and non loyalty obliging Protestants were sought out by the King's and/or Parliament's orders to ban firearm's possession. A perceived societal ill of disloyalty to the Crown connotes dissidence and not lawlessness. The *Jackson* majority cites to these events as part of the historical record supporting a *Bruen* historical record.[4] In contrast, *Bruen* explicitly focuses upon conduct and not status. *See* Slip Op. at 8. Defendant contends English history is hardly part of the historical record the *Bruen* Court intended as part of its analytical framework for the United States or even colonial America. *Bruen* of course points to 1791 as a possible starting point for analysis which renders this English historical record irrelevant. *See* Slip Op. at 26, 31.

 *Jackson* next moves to colonial America and concentrates on the post Revolutionary War period for our country. The Eighth Circuit relies on a firearm ban on Native Americans, religious minorities, Torry loyalty groups, non violent hunting and taking of another individual's property. The Circuit then issues an amazing statement that "while some of these categorical groups would today be impermissible under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson,* at p. 2 of Section III. Any modern court would not look favorably on a patently unconstitutional theory or

---

 [4]*Bruen* itself found reliance on English history a poor substitute holding that it was "ambiguous at best" and that the Court found "little reason to think that the Framers would have thought it applicable in the New World." *See* pp. 26-31. More specifically, *Bruen* could not conclude that English law would have justified restricting the right to publicly bear arms which would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection.

discredited case law upon which to rely. It is hard to imagine a 21st Century American Court nodding with approval using ***Dred Scott*** or ***Plessy v. Ferguson*** as a precedent.[5]

District Courts in this Circuit should not rely on ***Jackson*** for another reason. The historical record which the Eighth Circuit relied on is the same and otherwise substantially similar to the historical record Judge Wood relied on in her dissent in ***Atkinson***. Her argument was rejected by the majority as insufficient or otherwise not meeting the ***Bruen*** standard in ***Atkinson*** in its remand.[6]

## IV. ARGUMENT

### A. The Possession of Firearms by Felons Is Not Protected Under the Plain Text of the Second Amendment

While the Government states that "[l]egislatures historically have had wide latitude to exclude felons from the political community as a consequence of their convictions", it does not identify and cite any historical law, much less an historical trend, that made it illegal for ex-felons to possess guns. Instead, it rehashes the conclusory presumptions of the ***Bruen Heller*** dicta. It argues from a nineteeth century treatise by Thomas Coley that "[f]elons therefore could historically be excluded from 'exercising the elective franchise' . . .as well as from other closely

---

[5]Historical disarmament applying to status , i.e., Catholics, women, slaves, former slaves , persons of color, and immigrants would not be constitutional under the Equal Protection Clause today.

[6]The ***Atkinson*** dissent looked to English law from the Middle Ages to William and Mary of Orange. It discussed the Standing Army in the Revolutionary War and Shay's Rebellion, loyalty oaths and other political protests. It attempted to analogize classes and other groups such as rebelling slaves, native people, and others deemed dangerous to the "political community" but not whether any of these particular analogies specifically incorporated felons within those groups. *See Atkinson*, 22-1557, p. 25, 28, 35 n. 2.

related 'political rights' belonging to 'First–Class Citizens" [so called] 'political rights' such as holding public office and voting." This raises questions which go unanswered. Did nineteenth century America pass laws limiting the Second Amendment rights of felons? The Court is left to guess here. Is the so called "political" right to serve on a jury or vote equivalent to a citizen's Second Amendment rights to serve as a *Bruen* analogy for the historical record? Were any of these forfeited rights permanent bans or were individuals given recourse to regain those rights?

Further *Bruen* clearly stands for the proposition that ". . . self-defense is the central component of the [Second Amendment] right itself." *Bruen*, p. 24, *citing Heller*, 554 U.S. at 599 and *McDonald*, 561 U.S. at 767. As such, lower courts cannot simply rely on dicta from any of the previous Second Amendment cases since this core interest is not less salient for individuals with a prior conviction than it is for individuals without such.

The insufficiency of the Government's efforts is recently displayed by *Bullock*. The latter performed the requisite inquiry and concluded that no historical analogue existed for excluding felons from Second Amendment protection. *Bullock* reviewed the various groups cited by the Government here as well as in the *Atkinson* dissent and in *Jackson* and rejected any "relevant distinctive similarity" of them to today's weapons-bans based on felony status. *Bullock* concluded the historical ill supporting historical weapons-bans was insurrection against the government, not mere commonplace felony. The Government's response mentions *Bullock* but misses that ordinary felons are not *per se* insurrectionists.

The Government's attempt to compare history's societal ills to the current law pretends this "question of law" relieves it from gathering more facts. On the contrary, *Bruen* and *Atkinson* require a fulsome inquiry, which is invariably a factual search for relevantly similar

8

laws. The Government cannot satisfy its burden by attributing the absence of similar historical laws to our ancestors' unwritten "assumption" of not needing to enact them. It was not obvious to our Founders that felons should not bear arms when bearing arms by felons was not prohibited.

Additionally, the Government makes no attempt to address *Atkinson's* concern with the statute's impact, i.e., whether it is burdensome, minimal or remedial on the exercise of the Second Amendment right. Failure to address this is fatally telling since §922(g)(1) is in fact inalterably burdensome on the constitutional right. This is true because it is a lifetime ban with no recourse. This is a particularly significant impairment of a constitutional right since *Bruen* identifies the core of the Second Amendment as self defense. Silence on the issue of lifetime bans is a weakness in the Government's research with any possible reference to temporary bans or property forfeiture as not analogous.

Finally, the Government at various times in its argument defends the constitutionality of §922(g)(1) "as applied". It is not clear but the Government may be arguing the Defendant has no standing. If in fact this is its aim, Defendant addresses this issue here. Defendant has standing to raise both a facial challenge to the statute's constitutionality and to the constitutionality as applied to him. He is a member of the class based on prior felony status. The statute applies to him because of his prior felony convictions. The statute does not distinguish between violent and non violent felonies. Defendant has one violent felony conviction from 2007 when he was a juvenile and a 2016 conviction for being a felon in possession of a firearm. As applied to him, a lifetime deprivation of the right to self defense under the Second Amendment with no recourse is unduly severe.

**Defendant's Response to Government's Exhibit B**

Defendant separates this section because of the importance under the ***Bruen*** analysis whether the Government has sustained its burden of historical support.  Defendant earlier noted that the Government has not provided the necessary historical record and analysis.  The Government's Exhibit B clearly does not and should be examined carefully.[7]

As noted from footnote 6 below, all Bates stamped references are contained in Exhibit A attached but reference the Government's original Exhibit B markings submitted to Defendant.

Exhibit B_001-003:    English statutes disarming Papists [i.e. an antiquated term for Roman Catholics].  No mention of "felon".

Exhibit B_004-007:    English statutes allowing Protestants to arm.  No mention of "felon".

Exhibit B_008-009:    Early Colonial discussion banning the selling of arms to Indians. No mention of "felon".

Exhibit B_010-011:    Early Colonial Virginia banning the selling of arms to Indians. No mention of "felon".

Exhibit B_012-013:    Early Records of Plymouth Colony regarding selling arms to Indians. No mention of "felon".

Exhibit B_014-015:    Early Rhode Island and Providence Plantations disarming Indians.

---

[7]Defendant notes that it is the Government's burden to provide the historical support for its position that the felon in possession statute is constitutional.  However, as previously filed in Docket 38, the Government's Exhibit B cannot be logged into.  Defendant contacted the Government's attorney who provided a pdf version with Bates stamp identification.  Defendant is providing the same Government's Exhibit B as Defendant's Reply Exhibit A (with the Government's Bates stamp markings) here solely for the purpose of completing Defendant's comments in this Reply.

No mention of "felon".

Exhibit B_016-017:    Early Colonial Virginia discussing "Negro Insurrection". Could not carry any offensive or defensive weapon without approval of master or face whipping. No mention of "felon."

Exhibit B_018-020:    Early Colonial New Jersey regarding disarming slaves. Because slaves were killing swine in the woods around the plantations, they were not allowed to carry a firearm or use a dog unless with the master's approval. No mention of "felon".

Exhibit B_021-024:    Early Colonial Pennsylvania regarding the whipping of slaves carrying weapons without their master's approval. No mention of "felon".

Exhibit B_025-034:    Early Colonial Maryland regarding banning "Negro" or other slave from being armed without master's approval. No mention of "felon."

Exhibit B_035-036:    Early Colonial Connecticut regarding Indians and guns. No mention of "felon".

Exhibit B_037-043:    Early Colonial New York regarding the whipping of slaves with armaments. No mention of "felon".

Exhibit B_044-049:    Early Colonial North Carolina regarding the forfeiting and fining of slaves carrying any weapons. No mention of "felon".

Exhibit B_050-051:    Early Colonial Pennsylvania regarding the armaments to Indians. No mention of "felon".

11

Exhibit B_052-054:    Early Colonial Georgia regarding no slaves with armaments without master's approval.  No mention of "felon".

"Revolutionary War Firearm Disqualification Laws"

Exhibit B_055-058:    Colonial (pre Revolution) Connecticut regarding disarming dissidents within the colony.  No mention of "felon".

Exhibit B_059-063:    Continental Congress regarding disarming dissidents in the colonies.  No mention of "felon."

Exhibit B_064-069:    Massachusetts regarding disarming dissenters.  No mention of felon.

Exhibit B_070-072:    Rhode Island and Providence Plantations regarding refusal to subscribe to Colony authority will result in confiscation of armaments.  No mention of "felon".

Exhibit B_073-077:    North Carolina generally regarding loyalty dissenters.  May be disarmed if fail to take oath or commit treason against the state. No mention of "felon".

Exhibit B_078-086:    New Jersey regarding types of treason and other felonies.  No mention of disarmament.

Exhibit B_087-091:    Pennsylvania regarding refusal to take loyalty oath and join the militia could be disarmed by a militia officer.  No mention of "felon".

Exhibit B_092- 094:    Virginia regarding refusal to take loyalty oath and join militia could be disarmed by a militia officer.  No mention of "felon".

Exhibit B_095-096:   North Carolina, Pennsylvania, Massachusetts all concern the use of militias for self defense. No mention of "felon" or disarming a particular class of individuals other than Quakers who were exempted from service.

Exhibit B_097-099:   Pennsylvania Ratifying Convention Debate mentions disarming for "crimes committed" [¶7] but doesn't identify the crimes. Unknown whether ever enacted. No mention of "felon".

Exhibit B_100-101:   Massachusetts Convention Debate concerning federal Bill of Rights. It is not Samuel Adams'[8] amendments but John Hancock's which led to Second Amendment. No mention of "felon".

Exhibit B_102-103   New Hampshire Convention Debate mentions right to bear arms but no disarmament unless active rebellion. No mention of "felon".

"Felony Punishment Laws"

Exhibit B_104-107:   Blackstone defining punishment of property forfeiture for commission of felony. No mention of disarmament.

Exhibit B_108:   Colonial Pennsylvania mentions "firing" another's abode but appears misplaced here since it reads more of setting fire to something and not firing upon. Does not mention felon or

---

[8]The Government discussed Samuel Adams as support for the Second Amendment to include only "peaceable citizens". *See Govt Response, p. 31)* First it should be noted that although the Government cited Samuel Adams as a "founding father", he was not related to the John (Quincy) Adams family. He was considered a radical by his colleagues (i.e., why it is okay to rebel against a constituted government). Most importantly, the convention cited by the Government in its own exhibit rejected Adams and relied instead on John Hancock's advocacy which carried the day regarding the Second Amendment and did not exclude felons.

13

disarming.

Exhibit B_109:      Colonial Pennsylvania notes criminal acts but nothing about disarmament.

Exhibit B_110:      Colonial Maryland regarding hindering King's proclamations and suffering property forfeiture. Makes stealing a crime. Nothing about disarment from other crimes.

It is apparent that the Government's Exhibit B does not provide the regulatory history of how our country dealt with the Second Amendment and felons. As argued above, the attempts to substitute groups such as those which are religious, racial or political based are not analogous to individuals convicted of felonies and must be found woefully insufficient to support a restriction on a Second Amendment right under ***Bruen***.

For all the reasons stated here as well as in Defendant's original Motion to Dismiss his Indictment and his Motion for Reconsideration, the relief requested in Defendant's Motions should be granted.

Respectfully submitted,
Ss//Donna Hickstein-Foley
Attorney for the Defendant

9644 South Hamilton
Chicago, IL 60643-1631
773 881 3800