IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 23 CR 158 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| DEVON FREEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

Defendant Freeman is charged with one count of being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Section 922(g)(1) prohibits possession of firearms by individuals who have been convicted of a felony. On May 3, 2023, defendant moved to dismiss the indictment (Doc. 27), arguing that the pending charge violates his rights under the Second Amendment to the United States Constitution. This court denied defendant's motion on June 1, 2023 (Doc. 30). On June 30, 2023, defendant filed the instant motion to reconsider this court's denial of his motion to dismiss the indictment (Doc. 32), in light of the Seventh Circuit's ruling in <u>Atkinson v. Garland</u>, 70 F.4th 1018 (7th Cir. 2023). For the reasons discussed below, defendant's motion to reconsider is granted (Doc. 32).

## <u>BACKGROUND</u>

Defendant is charged with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Section 922(g)(1) prohibits the possession of firearms by individuals convicted of felonies, or any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." Defendant has a felony criminal record, and a federal grand jury returned an indictment for one count against defendant pursuant to § 922(g)(1) on March 21, 2023.

On May 3, 2023, defendant filed a motion to dismiss the indictment in this case based on an alleged violation of his rights under the Second Amendment of the United States Constitution, which this court denied on June 1, 2023.  Defendant raised the issue pursuant to the Supreme Court's ruling in New York Rifle & Pistol Assn. v. Bruen, 142 S. Ct. 2111 (2022) ("Bruen"), and this court explained that "[t]he Supreme Court emphasized in Bruen that the Second Amendment right to keep and bear arms repeatedly contemplates 'law-abiding' citizens, and the Court recognized in Heller that the government has historically regulated firearm possession by individuals with felony convictions."  (Doc. 30).

Further, this court concluded that "[a]lthough the Seventh Circuit has not addressed this issue post-Bruen, its prior decisions suggest that § 922(g)(1) and similar regulations are constitutional pursuant to longstanding legislative efforts to prevent dangerous or untrustworthy persons from possessing and using firearms," citing United States v. Yancey, 621 F.3d 681, 683–686 (7th Cir. 2010).  Freeman brings his instant motion to reconsider based on the Seventh Circuit's review of the issue in Atkinson v. Garland, 70 F.4th 1018 (7th Cir. 2023) ("Atkinson"), which it issued on June 20, 2023 (after this court ruled on defendant's motion to dismiss).

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court determined that "the right secured by the Second Amendment is not unlimited."  Id. at 626.  In dicta, the Court cautioned that its decision did not cast doubt on "longstanding prohibitions on the possession of firearms by felons."  Id.  In McDonald v. Chicago, 561 U.S. 742 (2010), the Court further held that the Second Amendment right to keep and bear arms is fully applicable to the states by virtue of the Fourteenth Amendment.  Id. at 750.

2

Under <u>Heller</u> and <u>McDonald</u>, lower federal courts adopted a two-step, means-end framework to analyze challenges to firearms regulations under the Second Amendment.  <u>See</u>, <u>e.g.</u>, <u>Ezell v. City of Chicago</u>, 846 F.3d 888, 893 (7th Cir. 2017); <u>see also</u> <u>Kanter v. Barr</u>, 919 F.3d 437, 441–42 (7th Cir. 2019).

Recently, however, in <u>Bruen</u>, the Supreme Court considered the meaning of the Second Amendment and articulated an analytical framework to determine whether a firearm regulation is constitutional.  The Court again emphasized that certain firearms regulations remain constitutional, and that its newly articulated framework is "consistent with <u>Heller</u> and <u>McDonald</u>."  <u>Id.</u> at 2122.  It held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  <u>Id.</u> at 2126.  When the Second Amendment's plain text protects certain conduct, the government can regulate such conduct only if it can "affirmatively <u>prove</u> that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  <u>Id.</u> at 2127. (Emphasis added).  Otherwise, the court must conclude that the individual's firearm-related conduct is protected because it falls within the Second Amendment's "unqualified command." <u>Id.</u> at 2126 (internal quotations omitted).

The <u>Bruen</u> Court provides two avenues of historical inquiry.  The first avenue of inquiry is a "straightforward historical inquiry," which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century."  <u>Id.</u> at 2131.  Under this inquiry, courts must identify a "distinctly similar historical regulation addressing that problem." <u>Id.</u>  The second avenue of inquiry is by "analogy."  <u>Id.</u> at 2132.  Because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," there is not always straightforward

3

correspondence, and unprecedented societal concerns or dramatic technological changes may require a "more nuanced approach." Id. Under these circumstances, the Bruen Court directed courts to consider "historical analogies" to the challenged regulation to determine whether the regulation sufficiently resembles historically acceptable restrictions. Id.

Evaluating whether a historical regulation is a proper analogue for a for a "distinctly modern" firearm regulation requires a determination of whether the two regulations are "relevantly similar." Id. The Bruen Court directed lower courts to centrally consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." Id. at 2133. The Court emphasized that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." Id. It requires a "well-established and representative historical analogue, not a historical twin." Id. (Emphasis in original).

In Atkinson, the Seventh Circuit remanded a civil litigant's as-applied constitutional challenge to § 922(g)(1) for further analysis under Bruen. See 70 F.4th 1018, 1023 (7th Cir. 2023). The plaintiff was convicted of felony mail fraud 24 years earlier and filed his complaint pursuant to 18 U.S.C. § 925A. Id. at 1021–22. Because the district court dismissed his complaint before the Court articulated its "text and history" test in Bruen, and because the parties' appellate briefing did "not grapple with Bruen," the majority opinion in Atkinson remanded the matter "to allow the district court to undertake the Bruen analysis in the first instance." Id. at 1022. The court reasoned that "Bruen leaves no room for doubt: text and history, not a means-end analysis, now define the controlling Second Amendment inquiry." Id. at 1020. It also directed the government to "develop its contention that the plain text of the Second Amendment does not protect felons and other offenders impacted by § 922(g)(1)" on

4

remand, and to "conduct a more substantial historical analysis." Id. at 1024.

The Seventh Circuit instructed the government to develop a record that addresses a series of "interrelated and non-exhaustive questions" which are intended to "help focus the proper analysis on remand." Id. at 1023. These questions are:

1.  Does § 922(g)(1) address a 'general societal problem that has persisted since the 18th century?' ... If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?';

2.  What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g) (1). To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1);

3.  Are there broader historical analogues to § 922(g)(1) during the periods that Bruen emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1);

4.  If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible;

5.  If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? Bruen shows that

these distinctions should also have firm historical support.  See 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are 'relevantly similar,' including in terms of how and why the regulations burden gun rights)."

Id. at 1023–24.

The Atkinson court recognized that "the historical analysis required by Bruen will be difficult and no doubt yield some measure of indeterminacy."  Id. at 1024.

In dissent, Judge Wood stated that she would have upheld § 922(g)(1) as constitutional without remand.  Id. at 1025.  She explained that "[g]un ownership and use in his country (both before and after the adoption of the 1787 Constitution) have always been subject to reasonable regulations."  Id. at 1030.  These regulations make up "a vast and diverse array of gun laws stretching from the colonial period, through the Founding Era, through Reconstruction (when the Fourteenth Amendment was added to the Constitution and ultimately made the Second Amendment applicable to state regulation), up to the present day."  Id. at 1033.

According to Judge Wood, this "text, history, and tradition all point in the same direction."  Id.  Judge Wood determined that the record behind the felon disentitlement statutes "reveals that, since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed."  Id. at 1035.  In support, she cited loyalty oath laws, as well as laws that disarmed persons guilty of treason and members of native tribes.  Id.  While these laws would be unconstitutional today under the First and Fourteenth Amendments, Judge Wood concluded that "they reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted," which included categorical

restrictions.  Id.

## DISCUSSION

In the instant motion, defendant argues that this court erred in denying his motion to dismiss because it relied on assumptions that Heller and Bruen already concluded that the Second Amendment applies only to "law abiding citizens."  He emphasizes that the Court was not asked to decide whether § 922(g)(1) is constitutional in either case, and the Seventh Circuit confirmed in Atkins that the necessary analysis is more complicated.  According to defendant, Atkinson clarified that Bruen requires a more robust historical analysis than this court conducted in denying his motion to dismiss the indictment, and where lower courts have upheld § 922(g)(1) based on the now-discarded means-end test, or have engaged in insufficient historical review, their analysis does not meet in the standard set out in Bruen.

This court agrees that the Seventh Circuit's "interrelated and non-exhaustive questions" change its initial analysis regarding defendant's motion to dismiss his indictment.  Accordingly, this court begins with the first inquiry required under Bruen, which is whether defendant's alleged conduct is protected by the plain text of the Second Amendment.

From the government's perspective, § 922(g)(1) remains constitutional under Bruen's text and history test because individuals with felony convictions are not protected by the Second Amendment's textual purview.  The government argues that Heller demonstrates that felons do not fall within "the people" contemplated by the Second Amendment, and consequently their "right . . . to keep and bear Arms" is not infringed by § 922(g)(1)'s prohibition on their firearm possession.  554 U.S. 570, 580–81 (2008).  Instead, the government argues that the Second Amendment extends only to ordinary, law-abiding citizens who are "members of the political community."  Id. at 580.  According to the government, the Bruen majority did not deviate from

Heller's principle that the right to keep and bear arms is "not unlimited," and deliberately and repeatedly used the phrase "law-abiding, responsible citizens" to indicate that it interprets the Second Amendment to categorically exclude felons from its protection. Id. at 626, 635.

Further, the government argues, when an individual commits a felony, that individual experiences the "forfeiture of a number of rights" that are tied to membership in the political community, including the right to serve on a jury, vote, and hold elected office. See, e.g., 28 U.S.C. § 1865(b)(5) (barring felons from serving on a federal jury); Richardson v. Ramirez, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement); Spencer v. Kemna, 523 U.S. 1, 8–9 (1998) (noting that the consequences of a felony conviction may include deprivation of the right to hold office). Moreover, in United States v. Yancey, 621 F.3d 681, 684–85 (7th Cir. 2010), the Seventh Circuit, per curiam, determined that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"

The court agrees with defendant that Heller and Bruen did not hold that the Second Amendment categorically protects only law-abiding citizens, despite their repeated use of such qualified language as "law abiding citizens." The Heller Court explained that "the people" as used throughout the Constitution "unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. 570, 580 (2008). Moreover, while the Bruen majority determined that the New York statute at issue "violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," 142 S. Ct. 2111, 2156 (2022), Justice Alito stated in his concurrence that Bruen "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." 142 S. Ct. 2111, 2157 (2022). The Court implicitly acknowledged that it

8

did not conduct a thorough review of § 922(g)(1), which it directed lower courts to conduct in Bruen, by emphasizing that felon-dispossession statutes are only "presumptively lawful."  Heller, 554 U.S. at 627, n. 26.  (Emphasis added).

Similarly, the Seventh Circuit has not resolved the issue.  In Atkinson, the court did not decide whether the Second Amendment's plain text presumptively protects the possession of firearms by felons.  Instead, it stated that "[w]e cannot resolve the issue without the benefit of more substantial briefing on remand."  70 F.4th 1018, 1023 (7th Cir. 2023).  Prior to Bruen, however, the Seventh Circuit determined in United States v. Meza-Rodriguez, 798 F.3d 664, 669 (7th Cir. 2015), that "[w]hile some of Heller's language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.'"  (Internal citations omitted).  See also United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).  The court decided Meza-Rodriguez without the benefit of Bruen, but the Supreme Court specifically stated in Bruen that it did not disrupt Heller, and Heller is central to the court's analysis in Meza-Rodriguez.

In light of Meza-Rodriguez, and the parties' briefing pursuant to Bruen and Atkinson, this court concludes that the government has not met its burden to prove that felons are excluded from "the people" whose firearm possession is presumptively protected by the plain text of the Second Amendment.  Consequently, the court moves on to evaluate the second inquiry required by Bruen.

Under Bruen, the government has the authority to regulate presumptively protected conduct under the Second Amendment when it can demonstrate that the statute is part of this nation's historical tradition of firearm regulation.  See 142 S. Ct. at 2127.  The government can

succeed under <u>Bruen</u>'s "straightforward historical inquiry" if it can identify a "distinctly similar historical regulation" addressing a "general societal problem that has persisted since the 18th century." <u>Id.</u> at 2131. On the other hand, where a "distinctly modern" regulation is at issue, the government must offer a historical regulation that is "relevantly similar." <u>Id.</u> at 2132. Pursuant to this inquiry, this court must determine whether historical regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified" as the burden imposed by § 922(g)(1). <u>Id.</u> at 2133.

There is now a circuit split on the issue. In <u>United States v. Jackson</u>, 69 F.4th 495, 505–06 (8th Cir. 2023), the Eighth Circuit upheld § 922(g)(1) as applied to a defendant convicted of state law felonies for selling controlled substances. The court determined that the nation's historical record supported the government's ability to "prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." <u>Id.</u> at 504. Conversely, in <u>Range v. Attorney General of the United States of America</u>, 69 F.4th 96, 106 (2023) (<u>en banc</u>), the Third Circuit held that § 922(g)(1) was unconstitutional as applied to a defendant convicted of the felony-equivalent state offense of making a false statement to obtain food stamp assistance. The court reasoned that the government did not carry its burden to show that this nation's history and tradition of firearm regulation supported disarming him. <u>Id.</u> at 98.

In the instant case, the government argues that § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." <u>Bruen</u>, 142 S. Ct. at 2127. The government does not argue about whether earlier generations addressed the general societal problem of firearm-related violence with similar or materially different means. Nor could it. As the Seventh Circuit acknowledged in <u>United States v. Skoien</u>, 614 F.3d 638, 640 (7th Cir. 2010) (<u>en banc</u>), the first federal statute disqualifying certain violent felons from firearm possession was

10

not enacted until the Federal Firearms Act in 1938, which was 147 years after the ratification of the Second Amendment and 70 years after the ratification of the Fourteenth Amendment. See Pub. L. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938). Congress did not enact a lifetime ban on firearm possession by all felons until 1961. Pub. L. 87-342, 75 Stat. 757 (1961); see also 18 U.S.C. § 922(g)(1). There is no evidence of any law categorically restricting individuals with felony convictions from possessing firearms at the time of the Founding or ratification of the Second or Fourteenth Amendments. Instead, the government's argument is based on analogy to the modern-day statutes.

This court separately analyzes the burdens of and justifications for each type of historical regulation to determine whether § 922(g)(1) imposes a comparable burden on the right of armed self-defense and whether that burden is comparably justified. Its analysis relies on similar government briefing as other courts in this district that were, and continue to be, faced with the same difficult issue. See, e.g., United States v. Johnson, No. 18 CR 00458, 2023 WL 6690388 (N.D. Ill. Oct. 12, 2023); United States v. Johnson, No. 23 CR 156, 2023 WL 6276562 (N.D. Ill. Sept. 26, 2023); United States v. Gates, 22-CR-00397-1, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023). The government highlights two types of historical regulations that it argues are relevantly similar to § 922(g)(1): (1) laws that categorically disqualified "untrustworthy" adherents to the law from possessing firearms; and (2) laws that authorized capital punishment and estate forfeiture for certain felonies.

The government begins by arguing that the historical record shows an established tradition of broad legislative authority to categorically disqualify individuals from possessing firearms based on its judgment that certain groups could not be trusted to adhere to the rule of law. As mentioned above, the Seventh Circuit explained in United States v. Yancey, 621 F.3d

11

681, 684–85 (7th Cir. 2010) (per curiam), that legislatures have disarmed individuals who were deemed to be "unvirtuous citizens" as a historical practice.

First, the government offers evidence that the English government disarmed nonconformist Protestants in the seventeenth century, in addition to Catholics, when they refused to renounce their faith.[1] Such disarmament was based on the Protestant government's determination that nonconformist groups would not participate in the Church of England, which was headed by the King of England, as a matter of law. See Range v. Att'y General of the U.S., 69 F.4th 96, 120–21 (2023) (Krause, J., dissenting) (citing Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 45 (1994); Church of England, BBC (June 30, 2011), https://www.bbc.co.uk/religion/religions/christianity/cofe/cofe_1.shtml). Moreover, the Protestant government feared that the tenets of Catholicism necessarily included allegiance to the Pope, not the king, and Catholics could not be trusted to obey English law and its sovereign unless they renounced their faith. See An Act for the Better Secureing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (1689); see also Kanter v. Barr, 919 F.3d 437, 456–57 (7th Cir. 2019) (Barrett, J., dissenting). The same Parliament wrote the English Bill of Rights, which specifically stated that, "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." See An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, ch. 2 (1689). This clause in the English Bill of Rights, which recognized that

---

[1] This court agrees that English custom and tradition shed some light on the Second Amendment's purview. Quoting Heller, the Bruen Court explained that the Second Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." Bruen, 142 S. Ct. at 2127. This court emphasizes, however, that the "language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted, not as they existed in the Middle Ages." Id. at 2139 (internal quotations omitted) (emphasis in original). Accordingly, English history is more persuasive when it is closer in time to the framing and adoption of the U.S. Constitution, or otherwise tied to the Constitution.

Parliament had the authority to decide which citizens were allowed to keep and bear arms by law, became the predecessor to the Second Amendment. See Bruen, 142 S. Ct. at 2141.

The American colonies similarly disarmed Catholics, in addition to enslaved people and Native Americans. See Kanter, 919 F.3d at 457–58. Of course, the legislature is now rightfully prohibited from banning firearm possession based on race, sexual orientation, religion, disability, or other protected characteristics, see U.S. Const. Amends. I, XIV, but these historical regulations are relevant to understanding the right to keep and bear arms.

Importantly, although Catholics, enslaved people, and Native Americans were prohibited from firearm possession, individuals within these groups could possess firearms under certain circumstances. For example, Catholics who were "'willing to swear undivided allegiance to the sovereign' were permitted to keep their arms" when they pledged allegiance to the United States or a particular state. Kanter, 919 F.3d at 456–58. Enslaved people could possess firearms if they had permission from their master.[2] See, e.g., The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments, at 117–18 (1811) (1715 Md. Law) (prohibiting enslaved people from taking weapons off their master's land "without license from their said master"); A Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799, at 153–55 (1800) (1768 Ga. Law); Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne, at 341 (1753) (1694 N.J. law).

---

[2] Of course, enslaved people were not considered to be citizens of the United States, and consequently were not protected by the Constitution. See United States v. Jimenez-Shilon, 34 F.4th 1042, 1047 (11th Cir. 2022).

Moreover, the government does not provide evidence that Native Americans were prohibited from possessing firearms, except one Rhode Island law from 1677 that allowed the confiscation of guns owned by Native Americans if they did not have the necessary "ticket or order." Records of the Colony of Rhode Island and Providence Plantations, at 561 (1857) (1677 R.I. law). Instead, state legislatures typically prohibited the sale of firearms to Native Americans, not possession itself. See, e.g., Laws and Ordinances of New Netherland, 1638-1674, at 18–19 (1868) (1639 New Netherland law); Records Of The Colony Of New Plymouth, in New England, at 243 (1856) (1675 Plymouth law).[3]

In a similar manner, loyalty oath requirements allowed states to strip the right to keep and bear arms from anyone who failed or refused to take an oath throughout colonial America and the Revolutionary War. The legislature even disarmed free, Christian, white colonists (i.e., the core of the political community) whom the authorities believed could not be trusted to obey the law, such as Loyalists. During the Revolutionary War, several states (including Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey), as well as the Continental Congress, prohibited firearm possession by individuals who refused to declare a loyalty oath to the emerging government. See United States v. Jackson, 69 F.4th 495, 503 (8th Cir. 2023) (citing 4 Journals of the Continental Congress 1774–1789, at 205 (1906); Act of Mar. 14, 1776, ch. 21, 1775–76 Mass. Acts 479; Act of May 1777, ch. III, 9 The Statutes at Large; Being a Collection of all the Laws of Virginia 281–82 (1821); Act of June 13, 1777, ch. 756 §§ 2—4, 1777 Pa. Laws 110, 111–13; Act of June 1776, 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (1862); Act of Nov. 15, 1777, ch. 6, 1777

---

[3] Indeed, members of the Native American tribes were considered to be citizens of hostile foreign nations, and thus not included in "the people" protected by the Second Amendment. See United States v. Jimenez-Shilon, 34 F.4th 1042, 1047 (11th Cir. 2022).

N.C. Sess. Laws 231; Act of Sept. 20, 1777, ch. XL, 1777 N.J. Laws 90).  These groups could

regain the ability to keep and bear arms after taking the relevant oath.

      The historical record shows additional efforts to disarm individuals for crimes and danger

to the public during the Founding and the ratification debates.  For example, during the

Constitutional Convention in 1787, Antifederalists in Pennsylvania proposed a constitutional

amendment regarding the right to bear arms that was the predecessor to the Second Amendment.

See Bernard Schwartz, The Bill of Rights: A Documentary History 627, 628 (1971); see also

Carlton F.W. Larson, Four Exceptions in Search of A Theory: District of Columbia v. Heller and

Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1374–75 (2009).  The Antifederalists proposed that

"no law shall be passed for disarming the people or any of them unless for crimes committed, or

real danger of public injury from individuals."  Bernard Schwartz, The Bill of Rights: A

Documentary History 627, 665 (1971).  Of course, the Second Amendment does not include the

same language, but some scholars have opined that the Founders might not have objected to the

lack of language explicitly excluding felons because the limitation was understood.  See Stephen

P. Halbrook, The Founders' Second Amendment: Origins of the Right to Bear Arms 273 (2008).

      This court is persuaded that the text, history, and tradition of firearm-dispossession

statutes demonstrates that the legislature has the authority to categorically regulate firearm

possession by individuals who have demonstrated that they cannot be trusted to obey the law, or

pose some other danger to the political community if armed.  The record shows that these

categorical regulations are not isolated instances, and the Seventh Circuit has already determined

that "Congress enacted the [categorical] exclusions in § 922(g) to keep guns out of the hands of

presumptively risky people."  United States v. Yancey, F.3d 681, 683 (7th Cir. 2010).  The

record shows that the legislature has a longstanding tradition of justifying exclusion from the

right to keep and bear arms based on its assessment of that group's risk to the rule of law, whether based on mental health, criminal record, loyalty, or character.

Further, this court rejects the notion that history calls for an individualized assessment of risk, or a distinction between violent and nonviolent felonies. The record clearly demonstrates that across-the-board disqualifications from gun ownership are a part of this nation's traditional approach to gun regulation. This court also agrees with Judge Wood's reasoning in Atkinson that "inviting [courts] to consider the particular facts of every case, to see if the conduct underlying the conviction ought to support restrictions on gun rights . . . would impose impossible burdens on courts and prosecutors and would lead to an arbitrary patchwork of decisions—as far from the rule of law as one could imagine." 70 F.4th 1018, 1027 (7th Cir. 2023).

The inquiry required by Bruen, however, is not merely whether a dispossession statute's burden is "comparably justified," but also whether the statute imposes a "comparable burden" on the right itself. Bruen, 142 S. Ct. at 2133 (emphasis added). Although the historical record discussed above demonstrates this nation's tradition of "comparably justified" categorical dispossession statutes, the government has failed to meet its burden of providing evidence of a dispossession statute with a "comparable burden" to § 922(g)(1). Specifically, this court is not persuaded that the government has met its burden to show a "distinctly similar," or even a "relevantly similar," historical analogue to § 922(g)(1)'s permanent prohibition on firearm possession by felons, which can be lifted only by expungement, federal pardon, or other method of restoring civil rights that lifts the underlying offense from a "conviction" under § 922(g). 18 U.S.C. § 921(a)(20). See also Buchmeier v. United States, 581 F.3d 561 (7th Cir. 2009) (examining certain "method[s] of restoring civil rights" under Illinois law after an individual's

16

state sentence expired). Thus, for example, if a felon with one felony conviction receives an executive pardon for that conviction, he is no longer a felon with a "crime punishable by imprisonment for a term exceeding one year" under the statute.[4]

Conversely, loyalty oath laws, which are the strongest analogue to § 922(g)(1), allowed individuals deemed "untrustworthy" to regain their right to keep and bear arms by swearing an oath to a state or the United States, or by renouncing their faith. There is no similar opportunity under § 922(g)(1) for felons to regain their rights after demonstrating their ability to abide by the rule of law.[5]

Thus, this court concludes that § 922(g)(1) imposes a far greater burden on the right to keep and bear arms than the historical categorical exclusions from the people's Second Amendment right. The government has not demonstrated why the modern ubiquity of gun violence, and the heightened lethality of today's firearm technology compared to the Founding, justify a different result. This nation's gun violence problem is devastating, but does not change this result under Bruen, which this court finds rests on the severity of § 922(g)(1) rather than its categorical prohibition. The court does not address whether the Second Amendment would allow Congress to categorically prohibit felons from possessing a firearm for a term of years, or categorically prohibit possession but allow felons the opportunity to file a petition for restoration of their Second Amendment rights following rehabilitation and reintegration to society. Such hypothetical statutes, and their constitutionality, are not before the court today, although the

---

[4] This court respectfully disagrees with its esteemed colleague in United States v. Johnson, No. 18 CR 00458, 2023 WL 6690388, at *8 (N.D. Ill. Oct. 12, 2023), which noted that, "Once a felony is expunged, 'Illinois law restores all civil rights . . . including the right to carry a firearm.'" (Quoting United States v. Lloyd, 184 F.3d 695, 699 (7th Cir. 1999)). As noted above, once a felony conviction is expunged, the individual is no longer a felon with a "crime punishable by imprisonment for a term exceeding one year" and, therefore, not covered by § 922(g)(1).
[5] Because a felon has no opportunity to regain the right to keep and bear arms, this court questions the extent to which rehabilitation motivates criminal lawmaking—although this court notes that criminal lawmaking is a policy determination that is better made by legislatures, not federal courts. See Ewing v. California, 538 U.S. 11, 25 (2003).

court notes that there are dangers in constructing legislation that would invite courts to "consider the particular facts of every case," which Judge Wood reasonably envisioned would "pose impossible burdens on courts and prosecutors" in <u>Atkinson</u>. 70 F.4th 1018, 1027 (7th Cir. 2023).

This court's holding also does not change the fact that all individuals, including felons, are prohibited from using firearms to commit crimes and threaten violence, and it does not impact this nations' other restrictions, such as those on: selling or delivering "any destructive device, machinegun . . . , short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity" in § 922(b)(4); the sale and disposal of firearms to other categories of individuals listed in § 922(d); or firearm possession by other categories of individuals listed in § 922(g). These regulations are likewise not before the court today.

Therefore, the court next evaluates the government's second type of historical regulations, which it argues are "relevantly similar" to § 922(g)(1): laws that authorize capital punishment and estate forfeiture for certain felonies. According to the government, the law of England leading up to the colonial era authorized capital punishment and estate forfeiture for some felony convictions, citing Blackstone. <u>See</u> 4 William Blackstone, <u>Commentaries on the Laws of England</u> at 95 (1769) (defining a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded"). The First Congress continued this tradition, and made forging or counterfeiting public securities punishable by death. <u>See</u> <u>An Act for the Punishment of Certain Crimes Against the United States</u>, 1 Stat. 112, 115 (1790). As the D.C. Circuit noted in <u>Medina v. Whitaker</u>, 913 F.3d 152, 158 (D.C. Cir. 2019), "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope

18

of those entitled to possess arms."

This court, however, finds that these dispossession statutes are not "comparably justified" and do not impose a "comparabl[e] burden" to § 922(g)(1).  While this court agrees with the D.C. Circuit in <u>Medina</u> that capital punishment and estate forfeiture laws imposed severe consequences on certain felons, it also agrees with the Third Circuit in <u>Range</u> that these consequences "do[ ] not suggest that the <u>particular</u> (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition."  <u>Range v. Att'y General of the U.S.</u>, 69 F.4th 96, 105 (3d Cir. 2023).  Thus, in <u>Range</u>, Judge Krause acknowledged in dissent that certain severe offenses were <u>not</u> punishable by death or life imprisonment and, while "the offender was stripped of his then-existing estate, including any firearms," he could "presumably repurchase arms" "upon successfully serving [ ] his sentence and reintegrating into society."  <u>Id.</u> at 127–28.  As the Third Circuit reasoned, "[t]he Government has not cited a single statute or case that precludes a convict who has served his sentence from purchasing the same type of object that he used to commit a crime," nor "cited forfeiture cases in which the convict was prevented from regaining his possession, including firearms (except where forfeiture preceded execution)."  <u>Id.</u> at 105.

This court would go further than <u>Range</u> and recharacterize dispossession as a "consequence" of conviction, rather than "punishment."  As the Seventh Circuit determined in <u>Yancey</u>, Congress justified § 922(g)(1) with its determination that felons, as a group, cannot be trusted to follow the law.  621 F.3d 681, 684–85 (7th Cir. 2010) (<u>per curiam</u>).  The court did not state that Congress justified felon firearm dispossession in § 922(g)(1) as <u>punishment</u> for crime. In other words, dispossession is not a "punishment" for a felon's conviction <u>per se</u>; it is a consequence of a felon's <u>status</u> as an untrustworthy, lawbreaking citizen, and his conviction not

19

only causes this status, but is evidence of it.  Conversely, historical regulations that tied an individual's felony conviction to severe consequences (capital punishment and estate forfeiture) imposed punishment for the individual's crime, making them distinct from § 922(g)(1).

This court's conclusion is clearer when placed in context.  For example, as discussed above, after a felon is convicted, he can also lose the right to vote, serve on a jury, and hold elected office.  The loss of these rights is not punishment for a felony-level crime; it is a consequence of the legislature's determination that, categorically, that individual is now part of group of individuals (felons) who cannot be trusted to abide by the law, or otherwise act as trustworthy members of the political community, based on their actions.  If that individual is convicted of another felony, he will receive additional punishment in the form of imprisonment, which presumably punishes, deters, and/or rehabilitates him.  He will not, and logically could not be stripped again of his right to vote, serve on a jury, or hold elected office, which he permanently lost following his first felony.  Instead, he remains a member of that category of "untrustworthy" or otherwise "unvirtuous" individuals whose firearm possession has been historically limited.

This conclusion is bolstered by then-Judge Barrett's reasoning in dissent in Kanter v. Barr, 919 F.3d 437, 459–61 (7th Cir. 2019), which explains the diminished historical relationship between felonies and capital punishment at the Founding.  She explained that, "[d]uring the period leading up the founding, the connection between felonies and capital punishment started to fray," and the shifting punishment for felonies, which were not always punishable by death, "necessitated a shift in the meaning of civil death," or the loss of civic rights.[6]  Id. at 459.  She

---

[6] Then-Judge Barrett goes on to explain that the right to keep and bear arms under the Second Amendment is an "individual" right under Heller, not a "purely civic right" that is exercised for the benefit of the community, such as voting or jury service.  Id. at 462–63.

concluded that "[f]elons serving a term of terms did not suffer civil death; their rights were suspended but not destroyed." Id. at 461. The Kanter majority did not dispute then-Judge Barrett's explanation of the historical record; instead, it reasoned that the legislature could categorically disarm felons due to their poor, unvirtuous character, whereas then-Judge Barrett would have held otherwise. Id. at 446.

Consequently, this court concludes that the government has not met its burden under Bruen to prove this nation's history and tradition of firearm regulation with historical evidence of laws that authorized capital punishment and estate forfeiture for felonies.[7] Because this court determines that defendant is a member of "the people" protected by the Second Amendment, and because neither type of historical regulation offered by the government satisfies its burden to show a history and tradition of "relevantly similar" analogues to § 922(g)(1)'s permanent, categorical firearm dispossession of all felons, the court is forced to grant defendant's motion to dismiss the indictment against him under Bruen, whether he is challenging the statute as applied or on its face.

This court acknowledges that this is a close question. The court also recognizes that gun violence plagues our communities and that allowing those who potentially pose a threat to the orderly functioning of society to be armed is a dangerous precedent. See 18 U.S.C. § 922(q)(1). However, this court is unable to uphold § 922(g)(1) as constitutional due to Bruen's instruction that the government must provide evidence of a historical analogue that is both comparably

---

[7] The government's unmet burden is compounded by its decision not to offer any expert historian. As another district court stated in United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *17, 31 (S.D. Miss. June 28, 2023), the "historical community's guidance and expertise" is likely to aid courts in their analyses under Bruen, although the holding in Bullock (that § 922(g)(1) was unconstitutional as applied to the defendant, who completed his sentence for aggravated assault and manslaughter over 15 years prior) is limited to the facts of that case. It is not the court's burden to demonstrate history and tradition in this case by appointing its own independent expert, and the Court stated in Bruen that courts should "follow the principle of party presentation" and are "entitled to decide a case based on the historical record compiled by the parties." 142 S. Ct. 2111, 2130, n.6 (2022).

justified and comparably burdensome of the right to keep and bear arms. Although there are strong policy reasons for doing everything possible to keep guns off our streets and out of our communities—policies that could be addressed by legislation rather than judicial edict—this court can find no such historical analog.

## **CONCLUSION**

For the reasons set forth above, Freeman's motion to reconsider (Doc. 32) this court's denial of his motion to dismiss the indictment (Doc. 30) is granted. All other pending motions and dates set by the court are stricken as moot.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE:   November 7, 2023**